OPINION
{¶ 1} American Mutual Share Insurance Corporation ("ASI"), as the conservator of United Telephone Credit Union ("UTCU"), appeals the judgment of the Franklin County Court of Common Pleas granting summary judgment to CUMIS Insurance Society, Inc. ("CUMIS"). In the trial court, ASI, as conservator for UTCU, sought coverage under a fidelity bond issued by CUMIS. On appeal, ASI contends that the trial court erred by finding that CUMIS had no obligation to cover the losses suffered by UTCU. Because *Page 2 
UTCU did not timely give CUMIS notice of the discovery of loss, and because UTCU failed to bring a timely suit against CUMIS, we disagree.[1] Accordingly, we affirm the judgment of the trial court.
 I. {¶ 2} This particular chapter in ongoing litigation involving UTCU and its board began in 2001 when Union Eye Care Center, Inc. ("Union Eye") brought an action in the Cuyahoga County Common Pleas Court to oust Martin Hughes, UTCU's then Secretary and Manager, after it concluded Hughes had been involved in questionable financial transactions over a five-year period. At the time, Hughes was also president of Union Eye, a separate company, which performed an audit, relieved Hughes of his duties and placed him on an unpaid leave of absence. After Hughes refused to comply, Union Eye successfully sought a temporary restraining order ("TRO") against Hughes, which later became a preliminary injunction.[2] Union Eye then sued UTCU and its entire board of directors contending that Hughes unjustly enriched UTCU with assets from Union Eye.
 {¶ 3} Presumably, based in part on Union Eye's lawsuit against UTCU, ASI and the Department of Financial Institutions ("DFI") investigated UTCU. Following the initiation of the investigation, ASI, DFI, and UTCU entered into a supervisory agreement on July 18, 2002. The supervisory agreement did not allege that Hughes committed fraud, but did set forth several areas of concern, such as numerous instances of accounting and IRS noncompliance, improper investment and loan activities, and an *Page 3 
overall lack of financial control. The supervisory agreement required UTCU to take corrective measures and fully abide by its terms. All of UTCU's directors signed the supervisory agreement and were presumably aware of its contents.
 {¶ 4} Specifically, the supervisory agreement set forth several concerning facts, including the following: (1) 64 percent of UTCU's capital was invested in Fahey Bank, whose management structure and board were so intertwined with UTCU that "transactions between the entities [were] considered to be less than `arms length'"; (2) UTCU's annual, comprehensive audits for the present year and the previous four were not provided; (3) Hughes maintained a separate checkbook, which he used to pay expenses that appeared personal in nature; (4) Hughes did not provide a full accounting of the checks he had written, and thus, the account could never be fully reconciled; (5) UTCU did not maintain appropriate documentation in regards to disbursements, including reimbursements to Hughes; (6) UTCU's travel and expense plan was not properly structured under the Internal Revenue Code; (7) Hughes' 15-year employment contract with death benefit was atypical; (8) Hughes was making preferential loans to risky debtors; and (9) UTCU activities were being reported in the local press and in national trade publications.
 {¶ 5} In fact, the local newspaper published stories concerning Hughes' improper use of credit union funds for personal expenses. At least one of UTCU's directors admitted knowledge of the newspaper reports.
 {¶ 6} In October 2002, after execution of the supervisory agreement, Hughes orally agreed to settle the Union Eye litigation. UTCU, however, never executed a formal settlement agreement. Union Eye successfully moved to enforce the oral settlement *Page 4 
agreement in the trial court. However, the judgment enforcing the oral settlement agreement was later reversed on appeal and remanded to the trial court for, inter alia, a determination as to whether Hughes had the authority to bind UTCU to a settlement. See Morgan v. Hughes (Feb. 12, 2004), Cuyahoga App. No. 82916. Following the remand, the dispute between UTCU and Union Eye was settled for $175,000.
 {¶ 7} On February 24, 2003, DFI determined that UTCU violated the supervisory agreement. As a result, DFI appointed ASI conservator for UTCU. DFI's order appointing ASI as conservator found that on November 1, 2001, Hughes transferred $2,177,500 (fair market value) worth of stock held by UTCU to an account held by his wife. Six months after the transfer, Hughes' wife wrote a check for $220,475, purporting to cover the cost of the stock transferred to her. DFI expressly concluded that this action harmed the credit union and its members.
 {¶ 8} On February 27, 2003, three days after its appointment as UTCU's conservator, ASI served CUMIS with a discovery of loss, under a discovery of loss type of fidelity bond issued to UTCU. Under this type of bond, UTCU was obligated to discover and timely report the loss. Further, ASI asked CUMIS for a series of six-month extensions of the time period in which it had to give CUMIS proof of loss. CUMIS agreed to each extension under a reservation of rights, expressly stating that the extension was not a waiver of any rights. Finally, on June 17, 2004, ASI presented CUMIS with its proof of loss. CUMIS denied the claim.
 {¶ 9} The parties were subsequently unable to settle the dispute. On February 23, 2005, ASI, as conservator of UTCU, sued CUMIS. On December 9, 2005, CUMIS filed a motion for summary judgment arguing that, under the terms of the bond, *Page 5 
UTCU discovered the loss on July 18, 2002, and was, therefore, untimely in both notifying CUMIS of the loss and instituting a suit to recover under the bond. ASI also filed a motion for summary judgment. On July 13, 2008, the trial court granted CUMIS' motion, denied ASI's motion, and entered judgment in favor of CUMIS.
 {¶ 10} ASI now appeals the trial court's decision and asserts the following assignment of error:
 THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO APPELLEE CUMIS INSURANCE SOCIETY, INC (`CUMIS') BECAUSE THERE EXISTED GENUINE ISSUES OF MATERIAL FACT CONCERNING `COVERED LOSS' AND TIMELY SUBMISSION OF NOTICE OF `DISCOVERY OF LOSS,' PROOF OF LOSS AND COMMENCEMENT OF THE ACTION UNDER THE CREDIT UNION BOND ISSUED BY CUMIS TO APPELLANT UNITED TELEPHONE CREDIT UNION (`UTCU') AND CUMIS WAS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW.
 II. {¶ 11} ASI contends in its sole assignment of error that the trial court erred when it granted CUMIS' motion for summary judgment. We disagree. Our review is de novo. See, e.g., Comer v. Risko,106 Ohio St.3d 185, 2005-Ohio-4559, ¶ 8.
 {¶ 12} Summary judgment is appropriate only when it has been established (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party. Civ. R. 56(A). SeeBostic v. Connor (1988), 37 Ohio St.3d 144, 146; Morehead v. Conley
(1991), 75 Ohio App.3d 409, 411. In ruling on a motion for summary judgment, the court must construe *Page 6 
the record and all inferences therefrom in the opposing party's favor.Doe v. First United Methodist Church (1994), 68 Ohio St.3d 531, 535.
 {¶ 13} The burden of showing that no genuine issue of material fact exists falls upon the party who moves for summary judgment. Dresher v.Burt (1996), 75 Ohio St.3d 280, 294, citing Mitseff v. Wheeler (1988),38 Ohio St.3d 112, 115. However, once the movant supports his or her motion with appropriate evidentiary materials, the nonmoving party "may not rest upon mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ. R. 56(E). See, also, Wing v. Anchor Media, Ltd. ofTexas (1991), 59 Ohio St.3d 108, 111; Dresher at 294-295.
 {¶ 14} In reviewing whether an entry of summary judgment is appropriate, an appellate court must independently review the record and the inferences that can be drawn from it to determine whether the opposing party can possibly prevail. Morehead, at 411-412. "Accordingly, we afford no deference to the trial court's decision in answering that legal question." Id. at 412. See, also, Schwartz v. Bank-One,Portsmouth, N.A. (1992), 84 Ohio App.3d 806, 809.
 {¶ 15} Here, the primary issue concerns the date when UTCU first discovered a loss as the result of Hughes' actions and, therefore, triggering its duty to notify CUMIS of such loss. ASI contends that the loss was first discovered when they assumed control of UTCU on February 24, 2003. CUMIS argues that UTCU indisputably discovered the loss on July 18, 2002.
 {¶ 16} We begin our analysis by examining the language of the bond. Fidelity bonds are considered a form of insurance. U.S. Fidelity Guaranty Co. v. Freedman *Page 7 
(1925), 30 Ohio App. 305, 310-311. The construction and interpretation of insurance falls under the laws of contract and is a matter of law.Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241. As a result, we interpret the bond under the laws of contract.
 {¶ 17} When interpreting a contract, this court's role "is to give effect to the intent of the parties to the agreement." Westfield Ins.Co. v. Galatis, 100 Ohio St.3d 216, 2003-Ohio-5849, ¶ 11, citingHamilton Ins. Serv. Inc. v. Nationwide Ins. Cos. (1999),86 Ohio St.3d 270, citing Employers' Liab. Assur Corp. v. Roehm (1919),99 Ohio St. 343, syllabus; Section 28, Article II, Ohio Constitution. We will also examine the contract "as a whole and presume that the intent of the parties is reflected in the language used" by the parties in the contract. Id., citing Kelly v. Med. Life Ins. Co. (1987),31 Ohio St.3d 130, paragraph one of the syllabus.
 {¶ 18} We must also "look to the plain and ordinary meaning of the language used * * * unless another meaning is clearly apparent[.]" Id., citing Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241, paragraph two of the syllabus. "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." Id.
 {¶ 19} Here, the bond provides that: "We will pay you for your loss resulting directly from dishonest acts committed by an `employee' or `director,' acting alone or in collusion with others. Such dishonest acts must be committed by the `employee' or `director' with manifest intent to: a) Cause you to sustain such loss; and b) Obtain financial benefit for the `employee' or `director,' or for any other person or entity."
 {¶ 20} Condition 10 defines when discovery occurs: "This Bond applies to loss discovered by you while this Bond is in effect. Discovery occurs when you first become *Page 8 
aware of facts which would cause a reasonable person to assume that a loss of a type covered under this Bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred. The exact amount or details of loss may not be known at the time of discovery."
 {¶ 21} Condition 11 of the bond requires that CUMIS be given prompt notice after discovery of a loss: "You must send us written notice at the earliest practicable moment after Discovery of Loss, but not to exceed 60 days after such discovery, without regard to amount of whether the loss appears to exceed the deductible."
 {¶ 22} Condition 17 governs UTCU's right to bring a suit against CUMIS: "Legal proceedings against us to recover loss under this Bond: * * * b. Must be brought within two years after the Discovery of Loss."
 {¶ 23} Here, we conclude that the conditions of the bond plainly require that CUMIS be given notice of loss no later than 60 days after discovery of such loss "by you." We further conclude that "you" refers to UTCU, the party guaranteed under the bond. Next, we must determine when UTCU discovered the loss resulting from Hughes' conduct.
 {¶ 24} Knowledge obtained by a corporate director will be imputed to the entire corporation, when that information is obtained in the course and scope of employment and is related to a matter over which the director's authority extends. See State ex rel. Nicodemus v. Indus.Comm. (1983), 5 Ohio St.3d 58, 59-60. See, also, Hey v. Cummer (1950),89 Ohio App. 104, 119; London and Lancashire Indemn. Co. of America v.Fairbanks Steam Shovel Co. (1925), 112 Ohio St. 136, 149; RoyalAppliance Mfg. Co. v. Fernengel (Aug. 27, 1987), Cuyahoga App. No. 51268. Thus, if UTCU's corporate *Page 9 
directors discovered the loss, such knowledge is imputed to UTCU, thereby triggering UTCU's obligation to give notice to CUMIS before coverage under the bond applies.
 {¶ 25} Here, at the time the supervisory agreement was executed, the non-colluding directors had ample reason to believe that UTCU suffered some losses. First, they knew that Union Eye accused Hughes of defrauding it and removed him from his position. The facts in the supervisory agreement, in conjunction with the Union Eye litigation, suggested Hughes may be involved in a pattern of misbehavior which could have caused UTCU to suffer a loss.
 {¶ 26} Second, the supervisory agreement gave adequate notice to UTCU that Hughes likely improperly used UTCU assets. A few of the key points in the supervisory agreement suggested that Hughes was maintaining a separate checkbook which was not being reconciled; Hughes appeared to be improperly reimbursed for so-called expenses; and it appeared as if annual audits were not being done. In addition, the agreement discussed the general lack of financial control in the institution. Based on these facts, a reasonable person would have understood that Hughes may have depleted or misspent UTCU assets. Further, the fact that DFI was concerned enough to mandate a supervisory agreement would suggest to a reasonable person that UTCU assets had been at risk under Hughes' control.
 {¶ 27} Third, there were newspaper reports about Hughes' improper spending of UTCU assets. Not only did one director testify that she had knowledge of these reports, she stated she confronted Hughes about them. Further, the director believed that, assuming the article was true, Hughes' acts were illegal. And when confronted, Hughes' wife refused to answer. Certainly, with this information and the findings in the supervisory *Page 10 
agreement, a reasonable person would have reason to suspect that Hughes improperly used UTCU assets to his own benefit.
 {¶ 28} Therefore, after construing all of the foregoing facts in favor of ASI, as conservator for UTCU, we conclude that no later than July 18, 2002, i.e., the date of the supervisory agreement, the non-colluding directors had discovered facts that would cause a reasonable person to assume UTCU had suffered a covered loss. We also find that this knowledge is properly imputed to UTCU.
 {¶ 29} At the time the non-colluding directors discovered that UTCU had incurred a covered loss, UTCU was still under control of the board of directors. A credit union acts through its board of directors. R.C. 1733.15(A). See, also, United Tel. Credit Union v. Roberts,115 Ohio St.3d 464, 2007-Ohio-5247, ¶ 7. We conclude that the non-colluding directors discovered that UTCU probably incurred a covered loss as a result of Hughes' action. Further, we find that the board of directors had the authority to file a claim with CUMIS.
 {¶ 30} Thereafter, UTCU had 60 days from July 18, 2002 to give notice to CUMIS of loss. Giving notice to CUMIS acts as a condition precedent for coverage. Kornhauser v. Natl. Surety Co. (1926), 114 Ohio St. 24, paragraph three of the syllabus. However, UTCU never gave notice of loss to CUMIS. CUMIS did not receive notice of loss until notified by ASI on February 27, 2003. Therefore, UTCU did not timely satisfy the condition precedent for coverage. We recognize that ASI is not at fault for failing to satisfy the timely notice requirement because they had no obligation or authority to give notice until they were appointed conservator. *Page 11 
 {¶ 31} We also note that the bond required UTCU to bring legal action against CUMIS within two years from the discovery of loss. The action against CUMIS was not instituted until February 23, 2005, which again prevents UTCU from prevailing.
 {¶ 32} We further conclude that due to the lack of timely notice and commencement of litigation, CUMIS is not required to pay any of the damages sought by ASI, on behalf of UTCU. Under Section Q of the bond, audit expenses are only payable if they establish a "valid and collectible loss" under the bond. Further, ASI's claim for breach of fiduciary duty fails under Condition 9 of the bond, which states that the non-colluding directors were obligated to inform CUMIS of any dishonest or fraudulent act. The bond provided that after the dishonest or fraudulent occurrence, coverage for further incidents automatically terminated. And, of course, ASI's claim for attorney's fees fails because it failed to show coverage under the bond.
 {¶ 33} Therefore, in construing the evidence and all inferences therefrom in ASI's favor, we find that there is no genuine issue as to any material fact in any of the causes of action in issue; that CUMIS is entitled to judgment as a matter of law; and that reasonable minds can come to only one conclusion, and that conclusion is adverse to ASI.
 {¶ 34} Accordingly, we overrule ASI's sole assignment of error and affirm the
judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
SADLER and McGRATH, JJ., concur.
KLINE, J., of the Fourth Appellate District, sitting by assignment in the Tenth Appellate District.
[1] In its brief, for the first time, ASI raises the issue of whether CUMIS waived its right to assert that notice was untimely. We decline to consider such an argument raised for the first time on appeal. See, e.g., Swank v. Swank, Richland App. No. 07 CA 0061, 2008-Ohio-3997. In addition, CUMIS accepted the notice of loss under a reservation of right, which would defeat this argument.
[2] Hughes unsuccessfully challenged the TRO in several courts by a writ of prohibition. *Page 1